UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,

v.

LUKE JONES,
*Defendant*.

No. 3:99-cr-264-1 (VAB)

RULING AND ORDER ON FIRST STEP ACT MOTION
FOR IMMEDIATE RELEASE OR RESENTENCING

Luke Jones ("Defendant") moves for his resentencing under Section 404 of the First Step

Act. First Step Act Mot. for Resentencing, ECF No. 2636 (Jan. 8, 2020) ("Def.'s Mot."); *see also*

Mem. in Supp. of Def.'s Mot., ECF No. 2645 (Feb. 11, 2020) ("Def.'s Mem."). Mr. Jones is

currently serving four concurrent life sentences.

The United States of America (the "Government") has opposed this motion.

Government's Opp'n to Def.'s Mem., ECF No. 2657 (Mar. 26, 2020) ("Gov't Opp'n").

For the reasons explained below, the motion for immediate release or resentencing under

the First Step Act is **GRANTED in part and DENIED in part.**

Mr. Jones's sentence of incarceration shall be reduced to **450 months**, which will be

followed by a term of supervised release of **FIVE (5) YEARS**.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

Mr. Jones has been in federal custody since January 7, 2000, because of his leadership of

and involvement with a violent drug trafficking enterprise in Bridgeport, Connecticut, in the late

1990s. First Step Act of 2018 Addendum to the Presentence Report, ECF No. 2643 at 6 (Jan. 21,

2020) ("First Step Suppl. PSR"); *see also United States v. Luke Jones*, 482 F.3d 60, 63–66 (2d

1

Cir. 2006) (detailing evidence as to the conspiracy introduced at trial against Mr. Jones in light most favorable to the Government), *cert. denied sub nom. Jones v. United States*, 549 U.S. 1231 (2007).

On November 16, 1999, a federal grand jury returned the original indictment in this far-ranging drug conspiracy case against Mr. Jones and two others. Sealed Indictment, ECF No. 1 (Nov. 16, 1999).

On October 25, 2001, after Mr. Jones pled guilty to Count Two of the First Superseding Indictment, which charged him with unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1), the Honorable Alan H. Nevas of the United States District Court for the District of Connecticut (this "District") sentenced Mr. Jones to 120 months imprisonment. First Judgment, ECF No. 782 (Oct. 25, 2001).

Following that sentencing, a federal grand jury returned the Fifth and Sixth Superseding Indictments, which charged Mr. Jones and other alleged members of the drug trafficking enterprise with various conspiracy and racketeering acts. *See* Fifth Superseding Indictment, ECF No. 813 (Dec. 20, 2001); Sixth Superseding Indictment, ECF No. 1083 (Aug. 8, 2002).

On October 30, 2003, omitting any later vacated convictions, a jury convicted Mr. Jones of violating 18 U.S.C. § 1962(c), Racketeering in Corrupt Organizations ("RICO") (Count One); 18 U.S.C. § 1962(d), RICO Conspiracy (Count Two); 21 U.S.C. §§ 841 and 846, Conspiracy to Possess with Intent to Distribute and Distribution of 50 Grams or More of Cocaine Base, 5 Kilograms or More of Cocaine, and 1 Kilogram or More of Heroin (Count Five), and Conspiracy to Possess with Intent to Distribute and Distribution of More Than 1000 Grams of Heroin and 50 Grams of Cocaine Base (Count Six); and 18 U.S.C. § 1959(a)(5), Conspiracy to Murder Lawson Day (Count Eighteen) and Anthony Scott (Count Twenty-One). Jury Verdict, ECF No. 1651

(Oct. 30, 2003). The underlying racketeering acts for Count One's RICO charges were Racketeering Acts 1-C (the Middle Court Drug Conspiracy), 1-D (the "D-Top" Drug Conspiracy), 9 (Conspiracy to Murder Foundation Members and Associates), 10-A (Conspiracy to Murder Lawson Day), and 11-A (Conspiracy to Murder Anthony Scott). *Id.* at 1–2. As to the drug conspiracy charges in Count Five, the jury assigned to Mr. Jones a quantity of 1000 grams or more of heroin, 5000 grams or more of cocaine, and 50 grams or more of cocaine base. *Id.* at 4–6. As to the drug conspiracy charges in Count Six, the jury assigned to Mr. Jones a quantity of 1000 grams or more of heroin and 50 grams or more of cocaine base. *Id.* at 7–9.

The jury initially also convicted Mr. Jones of the Murder of Monteneal Lawrence (Racketeering Act 8) and the Use of a Firearm in Relation to the Violent Crimes In Aid of Racketeering ("VICAR") Murder of Monteneal Lawrence (Count Seventeen), Jury Verdict at 1, 11; but on November 19, 2003, Judge Nevas granted Mr. Jones's motion for judgment of acquittal, Ruling on Def.'s Mot. for J. of Acquittal, ECF No. 1601 (Nov. 19, 2003) ("Rule 29 Ruling"). Although Judge Nevas had "no doubt that Jones intentionally killed Lawrence on the night of November 27, 1998," *id.* at 14, he found that "the evidence supporting this VICAR motive element is insufficient to sustain a conviction for the Lawrence murder," *id.* at 15. Judge Nevas held that "the evidence is insufficient to allow a reasonable jury to infer that Jones's general purpose in murdering Lawrence was to maintain or increase his position in the [drug trafficking] [e]nterprise." *Id.* at 30.

On January 7, 2004, Judge Nevas sentenced Mr. Jones to the maximum of life imprisonment with no prospect of parole on Counts One, Two, Five and Six; ten years imprisonment on Counts Eighteen and Twenty-One; a fine of $25,000; and a special assessment of $600. Judgment at 1, ECF No. 1654 (Jan. 7, 2004). The terms of imprisonment were to all run

"concurrent with each other and with the undischarged term of imprisonment." *Id.* Judge Nevas imposed a total effective supervised release term of five years and included the mandatory and standard conditions. *Id.* Later, on January 28, 2004, Judge Nevas waived the $25,000 fine due to Mr. Jones's inability to pay. Statement of Reasons at 4, ECF No. 2643-4 (Jan. 28, 2004).

On January 22, 2004, Mr. Jones appealed his conviction and sentence. Notice of Appeal, ECF No. 1667 (Jan. 22, 2004).

On June 30, 2006, the U.S. Court of Appeals for the Second Circuit (the "Second Circuit") affirmed Mr. Jones's judgments of conviction and rejected his ineffective assistance of counsel claim but remanded for resentencing consistent with *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). *Jones*, 482 F.3d at 68–79; *see also* Mandate of USCA, ECF No. 2108 (Oct. 18, 2006).

On April 30, 2007, Mr. Jones filed *pro se*[1] a motion and supporting memorandum for resentencing. Docket Entries, ECF Nos. 2194–95 (Apr. 30, 2007).

On June 5, 2007, Judge Nevas declined to re-sentence Mr. Jones:

> Having now considered Jones's *pro se* written submission and his counsel's April 26, 2007 letter[2], the court finds that . . . it would have imposed the same sentence as the sentence it originally imposed . . . The court has considered Jones's arguments that his criminal history should be considered in light of his difficult upbringing, that grouping various counts under the Sentencing Guidelines resulted in an excessive finding of the amount of narcotics attributable to him, and that the sentence imposed was . . . 'incongruent' with the statutory penalty for conspiracy to commit murder in aid of racketeering. Nevertheless, the court finds that it would again adopt the Sentencing Guidelines calculations described in the Presentence Report . . . Further, even if the court imposed a

---

[1] There is nothing in the record of this case explaining why, in 2007, Mr. Jones's appointed counsel did not file anything on the docket in support of Mr. Jones's resentencing. *See* Order, ECF No. 2154 (Feb. 26, 2007) (granting motion to appoint counsel and appointing Mr. White as counsel); Order, ECF No. 2169 (Mar. 23, 2007) (finding as moot motion to appoint counsel because Mr. White had already been appointed under the prior order).

[2] There appears to be no record of this letter from Mr. Jones's counsel at the time to the Court on the docket.

> nonguidelines sentence, such a sentence would not have been materially different from the sentence the court already imposed because of the extensive evidence of Jones's leadership role in a violent drug-trafficking organization and his involvement in two murders.

Order on Crosby Remand, ECF No. 2200 at 2–3 (June 5, 2007) (footnote added).

Judge Nevas also included his comments from the sentencing hearing, which he noted "reflect the court's view today, especially in light of the advisory nature of the Sentencing Guidelines:"

> I agree with all of those criticisms that have been leveled at the guidelines, and I myself, on more than one occasion from this bench, have voiced such criticism, but in your case, your case is different.
>
> The sentence that's called for by the guidelines in your case is well deserved. The evidence of your guilt of the drug charges is overwhelming. You were the leader of a drug distribution ring at P.T. Barnum that fed cocaine, crack, heroine, marijuana into the Bridgeport community for many years, and poisoned hundreds, if not thousands, of people, including young children, young teenagers who were started on the road to drug addiction by narcotics that you were responsible for distributing.
>
> How many lives did you destroy as a result of the poison that you fed into the streets of Bridgeport? But you weren't satisfied with destroying lives through the drug trade. You were a murderer as well. You killed your first victim when you were only seventeen years old . . . .
>
> In this case, you were charged with killing Anthony Scott and Mont[e]neal Lawrence. The jury acquitted you of the Scott murder, but there is absolutely no doubt in the Court's mind, that you were guilty of that murder and you committed that murder and you participated in that murder.
>
> As to Mont[e]neal Lawrence—the murder of Mont[e]neal Lawrence, I venture to say that this Court never presided at a trial— has never presided at a trial and heard evidence of such a cold-blooded murder of an innocent victim, as was your murder of Mont[e]neal Lawrence, and what was Mont[e]neal Lawrence's crime? He got drunk . . . and solely on the word of your girlfriend, Shonte Fuell (phonetic), who told you that Mr. Lawrence spoke

disrespectfully to her, you shot and killed him in cold blood with witnesses all around, including small children, and then, after you murdered him in cold blood, you walked out the door, down the stairs, turned around and said, "Sorry," and continued outside. That was your sole expression of remorse for the cold-blooded murder of an innocent man . . . .

*Id.* at 3–4 (quoting Sent. Tr. at 31:10–33:8, ECF No. 1649 (Jan. 7, 2004)).

On June 15, 2007, Mr. Jones appealed his resentencing. Notice of Appeal, ECF No. 2205 (June 15, 2007).

On September 24, 2008, the Second Circuit rejected Mr. Jones's arguments, and found Judge Nevas's resentencing was reasonable. Mandate of USCA at 4, ECF No. 2267 (Dec. 18, 2008).

Throughout the years, Mr. Jones sought relief, but all of his efforts were unsuccessful. *See* Ruling on Def.'s Mot. to Modify Sentence Under 18 U.S.C. § 3582(c)(1)(B), ECF No. 2360 (July 28, 2011) (noting that "the instant motion must fail" because Mr. Jones's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 was denied on July 14, 2011); Order Denying Mot. for Reconsideration, ECF No. 2369 (Feb. 8, 2012).

On December 21, 2018, Congress passed, and the President of the United States, Donald J. Trump, signed into law, the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (hereafter, the "First Step Act"), which made retroactive some provisions of the Fair Sentencing Act of 2010, Pub. L. 111-220; 124 Stat. 2372]. *See* First Step Act § 404(b) ("A court that imposed a sentence for a covered offense may, on motion of the defendant, the Director of the Bureau of Prisons, the attorney for the Government, or the court, impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 were in effect at the time the covered offense was committed." (citations omitted)).

On January 8, 2020, Mr. Jones moved for his immediate resentencing under Section 404 of the First Step Act. Def.'s Mot.

On January 21, 2020, the U.S. Probation Office filed a supplemental Pre-Sentencing Report, and took the position that Mr. Jones was not entitled to relief under the First Step Act. First Step Supp. PSR at 3–5.

On February 11, 2020, Mr. Jones filed a memorandum and numerous exhibits in support of his motion. Def.'s Mem. With the Court's consent, Mr. Jones also filed a sealed memorandum with additional exhibits documenting medical and other information. Sealed Def.'s Mem. ECF No. 2647 (Feb. 11, 2020).

On March 26, 2020, the Government opposed Mr. Jones's motion. Gov't Opp'n.

On April 17, 2020, the Government filed a notice of documents cited in its opposition. Notice, ECF No. 2672 (Apr. 17, 2020).

On April 24, 2020 Mr. Jones filed a reply in further support of this motion. Reply Mem., ECF No. 2673 (Apr. 24, 2020) ("Def.'s Reply").

On May 5, 2020, the Court held a hearing by videoconference on this motion. Minute Entry, ECF No. 2676 (May 5, 2020).

During that hearing, Mr. Jones claimed that he was rehabilitated, and if released, would not return to the same crimes of his past. Instead, Mr. Jones expressed his interest in mentoring young men, spending more time with his family, and working on criminal justice reform.

Following Mr. Jones, the Court also heard from family members of a victim of Mr. Jones's crimes, distraught at the prospect of Mr. Jones's release. They emphasized that Mr. Jones had never contributed to the Bridgeport community, but had only harmed it. They described the

toll that Anthony's murder took on their family, and that they still had not recovered. They opposed Mr. Jones's release, now or at any time.

## II.     STANDARD OF REVIEW

Enacted in 2018, "Section 404 of the First Step Act authorizes retroactive application of Sections 2 and 3 of the Fair Sentencing Act to defendants who were sentenced for crack cocaine offenses committed prior to August 3, 2010." *United States v. Jamel Williams* ("*J. Williams*"), No. 03-CR-795, 2019 WL 3842597, at *2 (E.D.N.Y. Aug. 15, 2019). The Fair Sentencing Act of 2010 "reduced [future] statutory penalties for cocaine base[] offenses in order to alleviate the severe sentencing disparity between crack and powder cocaine." *United States v. Sampson,* 360 F. Supp. 3d 168, 169 (W.D.N.Y. Mar. 13, 2019) (internal citations and quotations omitted); *see also* Fair Sentencing Act of 2010, Pub. L. No. 220; 124 Stat. 2372 (hereafter "Fair Sentencing Act").

"Specifically, section 404 of the First Step Act permits 'a court that imposed a sentence for a covered offense' to 'impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 (Public Law 111-220; 124 Stat. 2372) were in effect at the time the covered offense was committed.'" *United States v. Lawrence Williams* ("*L. Williams*"), No. 03-CR-1334, 2019 WL 2865226, at *2 (S.D.N.Y. July 3, 2019) (quoting First Step Act § 404).

"The First Step Act does not mandate sentence reductions for defendants" who are eligible for relief. *United States v. Glore*, 371 F. Supp. 3d 524, 527 (E.D. Wis. Mar. 6, 2019). Instead, "it leaves to the court's discretion whether to reduce their sentences." *Id.*; *see also United States v. Rose*, 379 F. Supp. 3d 223, 233 (S.D.N.Y. May 24, 2019) ("Congress clearly intended relief under § 404 of the First Step Act to be discretionary, as the Act specifically

provides that '[n]othing in this section shall be construed to require a court to reduce any sentence pursuant to this section.'" (quoting First Step Act, § 404(c)).

## III.    DISCUSSION

Because Mr. Jones has already served his full ten-year term of imprisonment for conspiracy to murder Lawson Day (Count Eighteen) and Anthony Scott (Count Twenty-One), which ran concurrently to his terms of life imprisonment on the other charges, the Court need not address those sentences here.

The threshold issue is Mr. Jones's eligibility for relief, which requires the Court to determine first whether he was convicted of a "covered offense" under Section 404 of the First Step Act. If Mr. Jones is eligible for relief, the Court then must determine whether its discretion should be exercised to reduce his current sentence and, if so, by how much.

### A.  Covered Offense Under the First Step Act

Section 404(a) of the First Step Act defines a "covered offense" as "a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 (Public Law 111-220; 124 Stat. 2372), that was committed before August 3, 2010." First Step Act § 404(a).

Nothing in this language restricts eligibility to defendants who were only convicted of a singular violation of a federal criminal statute whose penalties were modified by section 2 or section 3 of the Fair Sentencing Act. So long as a defendant was convicted of "a violation"—i.e., at least one violation—for which the penalties were modified by section 2 or 3 of the Fair Sentencing Act, he or she is eligible for relief.

As a multitude of district courts across the country have now recognized, "[i]t is the statute of conviction, rather than a defendant's actual conduct, that determines a defendant's

eligibility under the First Step Act." *L. Williams*, 2019 WL 2865226, at *2 (S.D.N.Y. July 3, 2019) (citing *Rose*, 379 F. Supp. 3d at 228–31); *United States v. White*, No. 99-CR-628-04, 2019 WL 3228335, at *2 n.1 (S.D. Tex. July 17, 2019) (collecting forty-one district court cases reaching this conclusion); *see also United States v. Boulding*, 379 F. Supp. 3d 646, 651 (W.D. Mich. 2019) ("[E]ligibility under the language of the First Step Act turns on a simple, categorical question: namely, whether a defendant's offense of conviction was a crack cocaine offense affected by the Fair Sentencing Act. If so, the defendant is categorically eligible for consideration . . . ."); *but see White*, 2019 WL 3228335, at *5 ("Only a few courts have sided with the government's position that eligibility turns on the defendant's actual conduct, rather than the charged offense . . . ." (collecting cases)).

Eligibility for relief under the First Step Act thus turns not on whether a conviction, even if it incorporates several violations of criminal statutes, is a "covered offense," but whether there is a conviction of a violation of a criminal statute for which the statutory penalties were modified by section 2 or 3 of the Fair Sentencing Act. Because the Fair Sentencing Act modified the penalties for a crime involving 50 grams or more of crack cocaine, that crime is a "covered offense" for purposes of the First Step Act. First Step Act § 404(a); *see also* Fair Sentencing Act § 2(a)(1) ("striking '50 grams' and inserting '280 grams'").

The Government argues that Mr. Jones is ineligible for relief under the First Step Act; although it recognizes that courts in this District, including this Court, have "ruled against the Government on three legal issues that are relevant":

> First, the Court has held that the statute of conviction determines a defendant's eligibility under § 404, rather than the defendant's relevant or actual conduct. Second, the Court has found that a multi-object conspiracy to distribute both cocaine base and other drugs is a "covered offense," even though the statutory penalties for the charged quantity of heroin under 21 U.S.C. § 841(b)(1)(A) were not

> changed by § 404. Third, the Court has held that, under § 404, a defendant is eligible for reduction of an aggregate sentence if convicted on both a "covered offense" and non-covered offenses.

Gov't Opp'n at 15 (internal citations omitted). Thus, the Government "recogniz[es] that the Court is likely to follow its prior rulings" with respect to the legal conclusions.

The Court agrees.

First, as this Court and other courts in this District have previously held, the statute of conviction determines a defendant's eligibility under the First Step Act. *See United States v. Powell*, 99-cr-264-18 (VAB), 2019 WL 4889112, at *4 (D. Conn. Oct. 3, 2019) (collecting cases).

Before the Fair Sentencing Act's enactment, a jury convicted Mr. Jones, and Judge Nevas sentenced him for an offense involving 50 grams or more of crack cocaine, the statutory penalties for which were modified by Section 2 of the Fair Sentencing Act. Thus, his conviction was premised, at least in part, on his violation of 21 U.S.C. § 841(b)(1)(A). Mr. Jones therefore was convicted of a "covered offense" and is eligible for relief under the First Step Act.

But eligibility for relief does not create an entitlement to relief. *See Rose*, 379 F. Supp. 3d at 233 ("Congress clearly intended relief under § 404 of the First Step Act to be discretionary, as the Act specifically provides that '[n]othing in this section shall be construed to require a court to reduce any sentence pursuant to this section.'" (quoting First Step Act, § 404(c))); *see also United States v. Mack*, No. 00-323-02 (KSH), 2019 WL 3297495, at *12 (D.N.J. July 23, 2019) ("Finding these defendants eligible does not write off their responsibility for dealing in powder cocaine as well as dealing in crack cocaine. That constitutes a fact that bears on what relief these defendants are entitled to. What the Court finds now is that the jury's verdict does not disqualify the Mack defendants from consideration under § 404.").

Accordingly, having been convicted of a "covered offense," Mr. Jones is eligible for relief under the First Step Act.

### B.  Scope of Relief Under the First Step Act

Having concluded that Mr. Jones is eligible for relief under the First Step Act, the Court now must determine whether a sentence reduction is appropriate and, if so, what reduction is warranted.

As this Court has previously held, while the Court need not reach the issue of whether the First Step Act authorizes a "plenary re-sentencing," as some courts have held, *see, e.g.*, *United States v. Bobby Medina*, No. 3:05-cr-58 (SRU), 2019 WL 3769598, at *6 (D. Conn. July 17, 2019), unlike previous rounds of sentencing reform, "the First Step Act does not impose any artificial or guideline limits on a reviewing court." *Boulding*, 379 F. Supp. 3d at 651.

The Government argues that—assuming the Court finds it has the authority to reduce the defendant's sentence, as this Court has found with respect to Mr. Jones here—"the 18 U.S.C. § 3553(a) factors demonstrate that the Court should deny his motion." Gov't Opp'n at 16.

First, the Government emphasizes the nature and circumstances of the offense and asserts that Mr. Jones "has an extensive history of violent conduct, including several murders and attempted murders," which he engaged in "not only in connection with his drug trafficking business, but also in response to a minor personal grievance." *Id.* The Government contends that Mr. Jones's "vicious crimes and their catastrophic consequences for his victims and their families weighs heavily against a reduction of his sentence." *Id.*

Second, the Government argues that "the need to avoid unwarranted sentencing disparities weighs heavily against—rather than in favor of—his release." *Id.* at 18. According to the Government, Mr. Jones's history of crimes, particularly murders (charged and uncharged,

convicted and not), would make it unjust for his less violent co-defendants, such as Leonard

Jones and Aaron Harris, to serve the same sentence "when their crimes were less serious and

caused less suffering." *Id.* at 16–18. "Conversely, it would create an equally unjust disparity for

similarly murderous co-defendants (like [Leslie] Morris and [Willie] Nunley) to remain

incarcerated while Jones is released when they all engaged in similar homicidal conduct (and

especially since Jones is the worst of the lot." *Id.* at 18.

Third, the Government argues that the physical and medical changes Mr. Jones has

undergone during his time in prison does not constitute an "extraordinary physical impairment,"

as he suffers from the "same sorts of chronic ailments that many middle-aged men face." *Id.* The

Government contends that "[a] multiple murderer should be held in the most secure facilities, for

the protection of the public, BOP personnel, and other prisoners," and Mr. Jones "has no one but

himself to blame if he regrets that his crimes made him ineligible for lower security conditions of

confinement." *Id.* at 19. And despite the distressing effects of Mr. Jones's son's 2018 injuries

from a car crash, the Government submits that "it is necessarily the case that every prisoner

serving a life sentence is unavailable when his family needs him most." *Id.* Thus, the

Government does not believe that the circumstances of Mr. Jones's punishment weigh in favor of

a sentencing reduction. *Id.*

Fourth, the Government contends that Mr. Jones has not demonstrated "extraordinary

rehabilitation." *Id.* at 19 (quoting Def.'s Mem. at 27). The Government argues that Mr. Jones

"has never accepted responsibility for his murderous conduct or sought to make amends for the

harm he has caused," nor has he "availed himself of the opportunities offered in prison to shed

his criminal habits and thought process." *Id.* at 20 (footnote omitted). According to the

Government, Mr. Jones's "prison record shows only that he has done the minimum required of

all inmates by largely complying with prison rules," and "generalities that apply to most offenders offer no assurance that he can be safely released." *Id.* at 20–21. The Government concludes that "a term of life in prison remains a sufficient, but not greater than necessary, sentence." *Id.* at 23.

In reply, Mr. Jones raises seven arguments to the Government's opposition.

First, Mr. Jones argues that his "drug-trafficking activities were equally, if not less, extensive than many other people connected to this case who have now been released from prison." Def.'s Reply at 1–4.

Second, Mr. Jones contends that the Government cannot prove by a preponderance of the evidence that he murdered Anthony Scott, and he emphasizes the jury's acquittal of that charge at trial. *Id.* at 5–7.

Third, Mr. Jones asserts that relying on the murder of Monteneal Lawrence, which is conduct that Judge Nevas acquitted, *see* Rule 29 Ruling at 14–15, would result in "fundamental unfairness." Def.'s Reply at 1, 7–9. According to Mr. Jones, the Government should not be allowed to adopt an inconsistent theory of its case, since its "current argument that murdered Lawrence for a 'purely trivial' reason contradicts the government's prior theory of the case," which allowed the Government to argue that Mr. Jones's "'general purpose in murdering Lawrence was to maintain or increase his position in the enterprise.'" *Id.* at 8 (internal citations omitted). Furthermore, because Mr. Jones "remains subject to being charged with the Lawrence murder in state court," he maintains that he "has a Fifth Amendment right to remain silent about his acquitted conduct." *Id.* at 9.

Fourth, Mr. Jones argues he had a limited role in the conspiracy to murder Lawson Day, and more relevantly, that he has already served the maximum term of imprisonment for that conviction. *Id.* at 9–10.

Fifth, Mr. Jones contends that his criminal history is not materially distinguishable from his co-defendants who have already been resentenced to time served. *Id.* at 10–12. Other co-defendants who have been released "have had prior criminal convictions concerning violence . . . or committed acts of violence before [he] became involved with the conduct for which he is currently serving a life sentence." *Id.* at 11. Additionally, according to Mr. Jones, his criminal history also was incorrectly calculated in his 2004 Presentence Report, and he belongs in Criminal History Category II, not IV, which is a lower level than other co-defendants who have been released under the First Step Act, including Leonard Jones, who fell in Criminal History Category VI. *Id.* (internal citations omitted).

Sixth, Mr. Jones asserts that a sentence of time served would not result in unwarranted sentencing disparities with co-defendants Willie Nunley and Leslie Morris, who are "ineligible for a sentencing reduction . . . [due to] mandatory-minimum sentences passed by Congress and enforced by the government." *Id.* at 12–13.

Finally, Mr. Jones emphasizes his rehabilitation and notably, that he "has had a nearly spotless record of good conduct in the most violent and dangerous prisons in the world with no possibility of release." *Id.* at 13–14. Mr. Jones argues that he need not demonstrate "extraordinary rehabilitation" as a prerequisite to release, but regardless, that he "is now a different person," and that the Court should "consider this fact when deciding whether [he] lives or dies in prison." *Id.* at 14.

The Court agrees that its exercise of discretion should be informed by the § 3553(a) factors.

As an initial matter, as the *Boulding* court and as many other courts have held, the First Step Act calls for a level of discretion that is previously unseen in sentencing statutes. It does not "impose any extrinsic limits on a sentencing court." *Mack*, 2019 WL 3297495, at *12.

As already discussed, Mr. Jones's drug sentences for Counts Five and Six were determined from two counts of conviction that involved three types of drugs: cocaine, cocaine base (crack cocaine), and heroin. But Mr. Jones was not only convicted of the drug conspiracies—he was also convicted of RICO and RICO Conspiracy.

When Judge Nevas pronounced Mr. Jones's sentence, he noted the guidelines indicated a life sentence was warranted for each count of conviction, besides the conspiracies to commit murder in Counts Eighteen and Twenty-One. Sent. Tr. at 33:13–21 ("Therefore, it is the sentence of the Court that you be sentenced to the custody of the Bureau of Prisons for life in - - life on Counts One, Two, Five, and Six, and ten years on each of Counts Eighteen and Twenty-one, all of these terms to be served concurrently with each other, and to be served concurrently with the undischarged term of imprisonment that you are presently serving in the Bureau of Prisons.").

With respect to Counts Five and Six, the sentencing transcript thus indicates that Mr. Jones was sentenced under one sentencing package. Judge Nevas did not determine that sentence based on each individual drug, but instead imposed a sentence that would serve the ends of justice with respect to all drugs involved in the offense conduct.

The Court therefore finds that the crack cocaine violation was addressed with heroin and cocaine as part of a single sentencing package, and that these offenses are inextricably related. The Court thus has the authority to reduce Mr. Jones's entire drug conspiracy sentence under the

First Step Act. *See, e.g.*, *United States v. Triestman*, 178 F.3d 624, 630 (2d Cir. 1999) ("We therefore hold that the district court had the authority under § 2243 to dispose of the matter as law and justice require, and that this authority included the power to resentence Triestman to the overall term that he would have received on his interdependent sentencing package absent his unlawful § 924(c) conviction."); *see also id.* at 631–32 (collecting cases).

But that still leaves the question of how this Court should treat the RICO and RICO Conspiracy convictions.

The U.S. Probation Office recommended sentences for Mr. Jones for these counts, based on the 2003 Sentencing Guidelines:

> The guideline for Counts One and Two, which charge RICO and RICO Conspiracy is U.S.S.G. § 2El.l, comment (n.l) which directs that each underlying act be treated as if contained in a separate count of conviction. The defendant is convicted of Acts 1-C and 1-D which charge Drug Conspiracies, Act 9, which charges Conspiracy to Murder Foundation Members, Act 10-A, which charges Conspiracy to Murder Lawson Day, Act 11-A, which charges Conspiracy to Murder Anthony Scott, Counts Five and Six, which charge Drug Trafficking Conspiracies, Count 18, which charges Conspiracy to Murder Lawson Day, and Count Twenty One, which charge Conspiracy to Murder Anthony Scott, a.k.a. "A.K." The crimes of violence are prohibited from grouping under U.S.S.G. § 3Dl.2, and therefore a combined offense level is required under§ 3Dl.4.

2004 PSR ¶ 120. Consequently, the Sentencing Guidelines required the U.S. Probation Office (and the Court) to treat each underlying act in the RICO and RICO conspiracy counts as if they were separate counts, and then to group all closely related "counts" together. *See* U.S.S.G. § 2E1.1, cmt. n.1 ("Where there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction for the purposes of subsection (a)(2)."); U.S.S.G. § 3D1.2 ("All counts involving substantially the same harm shall be grouped together into a single Group.").

The U.S. Probation Office thus separated the drug conspiracy acts from the conspiracy to murder acts. The U.S. Probation Office then calculated the Sentencing Guidelines range applicable to each Group, and was required to use the offense level of the most serious of the counts comprising the Group, *i.e.*, the highest offense level of the counts as follows:

| | Group One<br>Drug Conspiracies (Count One, Acts 1-C and 1-D), RICO Conspiracy (Count Two), Drug Trafficking Conspiracies (Counts Five and Six) |
|---|---|
| **BASE Offense Level** | **38**<br>based on conspiracy to distribute > 1.5 kg cocaine base and 30 kg heroin, U.S.S.G. § 2D1.1(c)(1) |
| Specific Offense Characteristics | +2<br>based on possession of firearm in connection with the conspiracy, U.S.S.G. § 2D1.1(b)(1) |
| Adjustment for Role in Offense | +4<br>leader and organizer of five or more people |
| Victim Related Adjustment | 0 |
| Adjustment for Obstruction of Justice | 0 |
| **ADJUSTED Offense Level** | **44** |

| | **Group Two**<br>Conspiracy to Murder Foundation Members (Count One, Act 9),<br>RICO Conspiracy (Count Two) |
|---|---|
| **BASE Offense Level** | **28**<br>based on underlying racketeering activity, U.S.S.G. § 2A1.5(a) |
| Specific Offense Characteristics | 0 |
| Adjustment for Role in Offense | + 4<br>leader and organizer of five or more people who ensured members regularly carried firearms and wore bullet-proof vests |
| Victim Related Adjustment | 0 |
| Adjustment for Obstruction of Justice | 0 |
| **ADJUSTED Offense Level** | **32** |

| | **Group Three**<br>Conspiracy to Murder Lawson Day (Count One, Act 10-A),<br>RICO Conspiracy (Count Two),<br>Conspiracy to Murder Lawson Day (Count Eighteen) |
|---|---|
| **BASE Offense Level** | **28**<br>based on underlying racketeering activity, U.S.S.G. § 2E1.3(a)(2),<br>which would have constituted first degree murder, U.S.S.G. § 2A1.5(c)(2) |
| Specific Offense Characteristics | +8<br>victim sustained permanent or life threatening bodily injury; conspiracy to murder Lawson Day was undertaken to increase drug trafficking profits |
| Adjustment for Role in Offense | + 4<br>Mr. Jones helped to organize this murder, along with Lyle Jones, Willie Nunley, and Eugene Rhodes, to further the racketeering enterprise |
| Victim Related Adjustment | 0 |

| | |
|---|---|
| Adjustment for Obstruction of Justice | 0 |
| **ADJUSTED Offense Level** | **40** |

| | **Group Four**<br>Conspiracy to Murder Anthony Scott (Count One, Act 11-A),<br>RICO Conspiracy (Count Two),<br>Conspiracy to Murder Anthony Scott (Count Twenty-One) |
|---|---|
| **BASE Offense Level** | **43**<br>based on underlying racketeering act,<br>which resulted in the death of a victim, U.S.S.G. § 2A1.5(c)(1) |
| Specific Offense Characteristics | 0 |
| Adjustment for Role in Offense | + 4<br>leader who directed and organized his brother Lance and others to carry out the offense in retaliation for the victim's shooting of Leonard Jones, Mr. Jones's brother and partner |
| Victim Related Adjustment | 0 |
| Adjustment for Obstruction of Justice | 0 |
| **ADJUSTED Offense Level** | **47** |

*See* 2004 PSR ¶¶ 121–45. Because the offense level for Group Two was nine or more levels less

serious than Group Four, it was not assigned a "unit" for purposes of computing the total offense

level. *See* U.S.S.G. § 3D1.4(c) ("Disregard any Group that is 9 or more levels less serious than

the Group with the highest offense level. Such Groups will not increase the applicable offense

level but may provide a reason for sentencing at the higher end of the sentencing range for the

applicable offense level." (emphasis omitted)). Additionally, because Group Three was five to

eight levels less serious than Group Four, it was only signed a half-unit. *See* U.S.S.G. § 3D1.4(b)

("Count as one-half Unit any Group that is 5 to 8 levels less serious than the Group with the

highest offense level." (emphasis omitted)).

As a result, the U.S. Probation Office determined the combined adjusted offense level to

be 50 for all five counts of conviction, *id.* ¶¶ 146–54, but because this level was in excess of 43,

the Sentencing Guidelines required that Mr. Jones's offense level be reduced to 43, *id.* ¶ 155

(citing U.S.S.G. ch. 5, pt. A, cmt. n.2).

Those Sentencing Guideline calculations were applied to all five offenses of conviction,

resulting in a life sentence for four counts. *See* 2004 PSR ¶¶ 191–92 (stating that the statutory

provisions provided maximum terms of life for Counts One, Two, Five and Six, and a maximum

of ten years for Counts Eighteen and Twenty-One, and that "the guideline sentence is life").

Thus, while Judge Nevas pronounced individual life sentences for each count of conviction,

those sentences all flowed from a single offense level and Sentencing Guidelines calculation

determination—a Sentencing Guideline calculation substantially affected, if not driven, by the

base offense level for the crack cocaine violation.

Although Judge Nevas agreed that "the guidelines oftentimes require judges to impose

much harsher sentences than the defendants deserve," Sent. Tr. at 31:7–9, he noted that Mr.

Jones's case was "different," because the life "sentence . . . called for by the guidelines" was "well deserved," *id.* at 31:15–17. Judge Nevas spoke of Mr. Jones's sentence in the singular at sentencing, *see id.*, and at resentencing as well, *see* Order on Crosby Remand at 4 ("For these reasons, the court finds that it would not have sentenced Jones to a materially different sentence if, at the time of sentencing, the Guidelines had been advisory.").

The RICO, RICO Conspiracy, and heroin violations thus were addressed together, with the crack cocaine violation, as part of a single sentencing package, and these offenses are inextricably related. The Court therefore has the authority to reduce Mr. Jones's entire sentence under the First Step Act. *See Triestman*, 178 F.3d at 630 ("We therefore hold that the district court had the authority under § 2243 to dispose of the matter as law and justice require, and that this authority included the power to resentence Triestman to the overall term that he would have received on his interdependent sentencing package absent his unlawful § 924(c) conviction."); *see also id.* at 631–32 (collecting cases).

But this still leaves the question of whether—and how—the Court should exercise this discretion. The operative issue at this stage is whether there is a basis consistent with the First Step Act for reducing Mr. Jones's life sentence.

As for the RICO conviction for Count One under Racketeering Acts 9, 10-A, and 11-A, a conspiracy to commit murder conviction cannot drive the RICO statutory maximum penalty. *See Powell*, 2019 WL 4889112 at *8 ("[A] conspiracy to commit murder conviction requires a violation of Connecticut General Statutes, Sections 53a-48(a) and 53a-54a4e, . . . [which] carries a maximum penalty of 20 years' incarceration. As a result, . . . the conspiracy to commit murder charge provides no basis for a sentence longer than twenty years."). Additionally, as already noted, Mr. Jones has served his ten-year terms of imprisonment for Count Eighteen and Twenty-

One's conspiracy to commit murder convictions. *See* 2004 PSR ¶ 191 ("The maximum sentence in Counts Eighteen and Twenty One is not more than 10 years pursuant to 18 U.S.C. § 1959(a)(5)."); *see also* 18 U.S.C. § 1959(a)(5) (For violent crimes in aid of racketeering activity, "attempting or conspiring to commit murder or kidnapping . . . [is punishable] by imprisonment for not more than ten years or a fine under this title, or both . . . .").

Although the remaining counts provide a basis for a life sentence, the question remains, though, whether the sentence should be reduced.

In the exercise of its discretion under Section 404(b) of the First Step Act, the Court will consider all of the relevant factors under 18 U.S.C. § 3553(a) to impose "a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in (paragraph 2) of this subsection." *See*, *e.g.*, *Rose*, 379 F. Supp. 2d at 234 ("[E]ven if consideration of § 3553(a) factors is not expressly required by the First Step Act, the Court concludes that it is appropriate to use that familiar framework to guide the exercise of discretion conferred by the First Step Act.").

Under paragraph (2) of this subsection, the sentence must "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," as well as "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). In addition, the statute requires consideration of "the nature and circumstances of the offense and the history and characteristics of the defendant," "the kinds of sentences available," the relevant "sentencing range established" for the offense, and the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(1), (3), (4), and (6).

In considering the § 3553(a) factors, the Court recognizes the serious criminal behavior that led Judge Nevas to proclaim: "Mr. Jones, you don't deserve to live among civilized people. You should be locked away in a cage for the rest of your life, never to breathe free air again." Sent. Tr. at 33: 9–12. In his filings or his arguments to the Court, both on his behalf by his lawyer and his own statements, Mr. Jones fails to address why an experienced federal judge, one who sat through the trial and had an opportunity to review directly all of the relevant evidence regarding his criminal conduct, considered a life sentence a just sentence, even upon resentencing when the Sentencing Guidelines were only advisory.

Furthermore, as compared to the co-defendants who have been released under the First Step Act, Mr. Jones ignores the most obvious distinction: his past conviction for first-degree manslaughter. *See* 2004 PSR ¶ 157 (detailing Mr. Jones's earlier charge for manslaughter at age seventeen, and that Mr. Jones "stated that his actions in this matter were the result of self defense" before entering an *Alford* plea). The closest comparator to Mr. Jones is his nephew Lyle Jones, Jr., who was convicted of assault in the third degree for his attack on an ex-girlfriend, also the mother of one of his children. *See United States v. Lyle Jones*, No. 3:99-cr-264-6 (VAB), 2003 PSR ¶ 128, ECF No. 2517-3 (July 11, 2003) (describing how Pamela Jones, Lyle's mother, intervened on Terry Middleton's behalf after her son "punched [Terry] in the mouth," "slammed her to the ground," and "kick[ed] and stomp[ed] on her back"). Unlike with Judge Nevas and Mr. Jones, however, Judge Peter C. Dorsey, who presided over Lyle's trial, sentencing, and resentencing, was "not entirely content and at ease with a dead end sentence" for Lyle Jones. *United States v. Lyle Jones*, No. 3:99-cr-264-6 (VAB), Sent. Tr. at 26:5–6, ECF No. 1517 (Sept. 3, 2003).

In contrast, by including his comments from the original sentencing in his order declining to resentence Mr. Jones, Judge Nevas properly demonstrated serious concerns about the consequences of Mr. Jones's actions:

> How many lives did you destroy as a result of the poison that you fed into the streets of Bridgeport? But you weren't satisfied with destroying lives through the drug trade. You were a murderer as well. You killed your first victim when you were only seventeen years old . . . .

Order on Crosby Remand at 3 (internal citation omitted). Moreover, the statements by the family members of the victims also provide additional context for Mr. Jones's conduct. *See* Mot. Hrg. Tr. at 51:14, 53:13–15, ECF No. 2677 (May 5, 2020) ("This pain is deep. This hurt is deep. . . . He should never be able to walk the streets. He should never be able to have the opportunity to hurt anyone else again."); *id.* at 55:1–7 ("I will never forget the day this unfortunate event happened because it was a day I should cherish, being that I was at my graduation day, the last event I would see my brother. I could never get him back, and the person who took his life should never be rewarded by coming home. He should have to live his life in prison where he belongs."); *id.* at 56:17–20 ("He has an opportunity to live his life in prison. And if he wants to see, be a part of his kids' life, he can. We will never see Anthony again. All we have is a picture. A picture."); *id.* at 59:8–9, 60:7–8, 60:12–14, 60:22–23 ("We all have sat here and we have listened to this monster. . . . He doesn't deserve a second chance. Second chance? . . . That's just who he is. That's not going to change. He is who he is. So why should we keep paying for his crimes? . . . Please, your Honor, do not let this monster out on the streets ever.").

As a result, a reconsideration of the length of Mr. Jones's sentence cannot and should not be construed as either a reconsideration of his underlying conviction or a reconsideration of the propriety of a lengthy sentence for this conviction. Mr. Jones should have received and should

serve a lengthy prison sentence. Instead, having determined that Mr. Jones is eligible for consideration of relief under the First Step Act, the issue is whether the length of that sentence should be reduced, having taken into consideration his various criminal acts and all of the other factors relevant under 18 U.S.C. § 3553(a).

The arguments for not reconsidering Mr. Jones's concurrent life sentences are compelling. As the Government powerfully argued both directly and through the statements of the victims' families, someone like Mr. Jones should serve the remainder of his life in prison. Indeed, at the time of his original sentencing, there was no other logical choice, even if the Sentencing Guidelines were not mandatory. *Cf.* Order on Crosby Remand at 2–3 ("[E]ven if the court imposed a nonguidelines sentence, such a sentence would not have been materially different from the sentence the court already imposed because of the extensive evidence of Jones's leadership role in a violent drug-trafficking organization and his involvement in two murders.").

But the First Step Act—although it does not require this Court to reduce Mr. Jones's current sentence—does require this Court to consider Mr. Jones now, and not just consider Mr. Jones at the time of his original sentence or even subsequent resentencing. *See Rose*, 379 F. Supp. 3d at 233–34 ("The text of the First Step Act, read in conjunction with other sentencing statutes, requires the Court to consider all relevant facts, including developments since the original sentence. . . . The principle set forth in *Pepper* [*v. United States*, 562 U.S. 476 (2011)] and § 3661 requires that the district court be able to consider the most recent evidence of a defendant's life and characteristics, which may be the most probative information available, when deciding whether a defendant should continue to be incarcerated or, in some cases, immediately released." (footnote omitted)). And Mr. Jones's demonstrated commitment to

rehabilitation while in custody warrants a reduction of his life sentence. In his nearly two decades of incarceration, Mr. Jones has had a minimal disciplinary record, and in the last nine years, he has not incurred a single disciplinary ticket. *See* Def.'s Mem. at 9 n.7 ("His most recent incident, in January 2011, is for . . . 'failing to stand count' and 'refusing to obey an order.' . . . Luke's only other ticket, in April 2003 . . . is for 'being insolent to staff member' . . .").

Furthermore, his most recent progress report from the Bureau of Prisons states that he "demonstrates positive institutional adjustment on a daily basis and is a role model for younger and/or less mature inmates." Ex. C: BOP Progress Report at 2, ECF No. 2645-3 (Jan. 28, 2020). In addition, while incarcerated, Mr. Jones has taken advantage of the educational courses, vocational training, and other Bureau of Prisons programming that has been available to him. First Step Suppl. PSR, Inmate Education Data, ECF No. 2643-5 (Jan. 14, 2020) (listing the over thirty courses completed by Mr. Jones); *see also* Def.'s Mem. at 9 ("Luke has participated in hundreds of hours of education programming . . . [and] [o]n January 30, 2019, Mr. Jones completed the BOP Drug Education Program." (internal citation omitted)); Ex. W: Drug Education Certificate of Completion, ECF No. 2645-18 (May 1, 2007).

Mr. Jones's rehabilitation efforts—rehabilitation undertaken without any reasonable prospect of a reduced sentence—thus support a reduction of his sentence. *See Pepper v. United States*, 562 U.S. 476, 491 (2011) ("[E]vidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing.").

While the Government argues that the absence of disciplinary problems during Mr. Jones's incarceration is "the minimum expected of him as a prisoner," Mot. Hrg. Tr. at 49:8, the significance of compliance with prison rules and regulations to the safety of both other inmates

and the correctional officers charged with managing them should not be understated. *See Burns v. Martuscello*, 890 F.3d 77, 87 (2d Cir. 2018) ("Maintaining prison security and protecting against increased inmate violence is central to all other corrections goals." (internal formatting and citations omitted)); *cf. Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) (recognizing that "prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison").

Indeed, the U.S. Constitution, through both the Eighth and Fourteenth Amendments, "impose[s] an undisputed duty[3] on correctional officers to protect prisoners or detainees from violence at the hands of their fellow prisoners or detainees." *Brewster v. Nassau Cty.*, 349 F. Supp. 2d 540, 552 (E.D.N.Y. 2004); *see Robinson v. U.S. Bureau of Prisons*, 244 F. Supp. 2d 57, 59–60 (N.D.N.Y. 2003) (inmate's mother sued when her son died while incarcerated due to an attack by another inmate during a chess game). As a result, the use of good-time credits to reward prisoners and shorten their terms of incarceration has been and continues to be an important tool essential to the efficient and safe functioning of prisons. *See Barber v. Thomas*, 560 U.S. 474, 482 (2010) ("The good time exception . . . is earned at the end of the year after compliance with institutional rules is demonstrated and thereby rewards and reinforces a readily identifiable period of good behavior." (citing 18 U.S.C. § 3624(b))).

Moreover, before this current prison term, there is nothing in Mr. Jones's history to suggest that he would abide by any rules, much less the rules and regulations of prison life. *See*

---

3 This constitutional duty creates risks to the safety of correctional officers. *See* Srinivas Konda et al., *Occupational Injuries among U.S. Correctional Officers, 1999 –2008*, 43 J SAFETY RES. 181, 183 (2012) (finding that "assault and violent acts were the leading occupational injury events for correctional officers . . . more than one-third of [assaults and violent acts as a source of injury among correctional officers] occurred while restraining or interacting with an inmate during a fight.").

2004 PSR ¶ 157 (describing Mr. Jones's conviction for manslaughter in 1986); *id.* ¶ 158

(describing the $250 for breach of peace on June 25, 1997, when Mr. Jones "punched one of the

[police] officers while yelling to the crowd 'get the police'"); *id.* ¶¶ 159–63 (describing charges

for wearing illegal body armor on October 22, 1998; February 27, 1999; May 27, 1999; June 9,

1999; and July 13, 1999); *id.* ¶ 164 (describing the conviction for possession of a firearm by a

convicted felon). As a result, his compliance and his efforts to be a positive influence on other

prisoners demonstrates commendable progress, progress sustained over a long period of time.

*See* BOP Progress Report at 2 ("[Mr. Jones] demonstrates positive institutional adjustment on a

daily basis and is a role model for younger and/or less mature inmates.").

  As a result, having considered all of the relevant factors under 18 U.S.C. § 3553(a), Mr.

Jones's four concurrent life sentences shall be reduced to a sentence of 450 months, a sentence

consistent with the broad remedial purpose of the First Step Act. *See* First Step Act, H.R. Rep.

No. 115-699 at 22 (2018) ("The federal prison system needs to be reformed through the

implementation of corrections policy reforms designed to enhance public safety by improving

the effectiveness and efficiency of the federal prison system in order to control corrections

spending, manage the prison population, and reduce recidivism.").

  This reduction takes into consideration all of Mr. Jones's relevant criminal conduct as

well as his rehabilitation efforts since these crimes. It is sufficient but not greater than necessary

to serve the purposes of a criminal sentence. *See* 18 U.S.C. § 3553(a) ("The Court shall impose a

sentence sufficient, but not greater than necessary, to comply with the purposes set forth in

(paragraph 2) of this subsection.").

  Given that several of Mr. Jones's co-defendants have recently had their sentences

reduced to time served, and Mr. Jones has served more time than any of those who have already

been released, this reduction—while reflecting a significant distinction—also avoids

unwarranted sentence disparities.4 *See Powell*, 2019 WL 4889112; *United States v. Damon*

*Walker*, Order Reducing Sentence, No. 3:99-cr-264-19, ECF No. 2536 (Aug. 27, 2019); *United*

*States v. Lonnie Jones*, Order Reducing Sentence, No. 3:99-cr-264-3, ECF No. 2558 (Aug. 27,

2019); *United States v. Kenneth Richardson*, Ruling and Order on First Step Act Mot. for

Immediate Release or Resentencing, No. 3:99-cr-264-8, ECF No. 2585 (Oct. 3, 2019); *United*

*States v. Lyle Jones*, Ruling and Order on First Step Act Mot. for Immediate Release or

Resentencing, No. 3:99-cr-264-6, ECF No. 2592 (Oct. 7, 2019); *United States v. Leonard Jones*,

Ruling and Order on First Step Act Mot. for Immediate Release or Resentencing, No. 3:99-cr-

264-5, ECF No. 2625 (Dec. 19, 2019); *United States v. Aaron Harris*, Ruling and Order on First

Step Act Mot. for Immediate Release or Resentencing, No. 3:99-cr-264-4 (VAB), ECF No. 2638

(Jan. 13, 2020). As the Court has already noted, Mr. Jones's past criminal history is markedly

different from his co-defendants. Consequently, Mr. Jones's reduced sentence must be higher

than these other co-defendants to prevent unwarranted sentencing disparities.5

---

4 Notably, in contrast to the original sentencing of Mr. Jones, or even his resentencing, the judges of many of his co-defendants lamented having to issue them life sentences. *See Kenneth Richardson*, Ruling and Order on First Step Act Mot. for Immediate Release or Resentencing, No. 3:99-cr-264-8, ECF No. 2585 at 15 (noting the difficulty in sentencing Mr. Richardson to life, because he was "young, obviously intelligent, articulate, who could have . . . been anything," but "got involved with people who convinced [him] that there was easy money in dealing drugs[.]" (internal citation omitted)); *Lyle Jones*, Ruling and Order on First Step Act Mot. for Immediate Release or Resentencing, No. 3:99-cr-264-6, ECF No. 2592 at 25 (commenting that "Life is a long sentence, I'm fully aware of that, and I am not entirely content and at ease with a dead sentence that you face, but as I said to Mr. Leonard Jones, if you in some way can establish through your conduct, in the meantime, your eligibility under a possibility of some kind of other relief in the form of a pardon or commutation of your sentence, you have the power to qualify yourself in that respect by virtue of your conduct in the meantime." (internal citation omitted)); *Leonard Jones*, Ruling and Order on First Step Act Mot. for Immediate Release or Resentencing, No. 3:99-cr-264-5, ECF No. 2625 at 16 (quoting Judge Dorsey "I commend that you, without in any way making you any commitment or promises, but what I'm saying to you is, within your hands, as far as the way you conduct yourself, you may find some ability to get relief from the sentence that would otherwise pertain.'" (internal citations omitted)); *Aaron Harris*, Ruling and Order on First Step Act Mot. for Immediate Release or Resentencing, No. 3:99-cr-264-4 (VAB), ECF No. 2638 at 12 (expressing "'frustration' and 'displeasure with the sentencing guidelines,' . . . ." (internal citations omitted)).

5 At the recent hearing, Mr. Jones could have—and arguably should have—focused more on his growth from his violent crimes rather than his efforts to assist other younger inmates. *See* Mot. Hrg. Tr. at 31:19–32:12 (describing

Judge Nevas imposed a $25,000 fine at sentencing, Judgment at 1, but in the later statement of reasons, he "waive[d] the fine due to the defendant's inability to pay." Statement of Reasons at 4. Because Mr. Jones has been incarcerated since January 7, 2000, the Court similarly finds that Mr. Jones does not have the ability to pay any fine now. *Cf. United States v. Walker*, 262 F. App'x 303, 309 (2d Cir. 2008) (finding error in imposing a $100,000 fine on Quinne Powell, Mr. Jones's co-defendant, without explaining the reasons for the fine or why the court found that Mr. Powell had the ability to pay the fine). Consequently, to the extent that any part of this fine remains, the Court will not impose this or any fine now.

Judge Nevas imposed a term of supervised release of five years on Counts One, Two, Five, and Six, and three years on Counts Eighteen and Twenty-One, to run concurrently in accordance with 18 U.S.C. § 3624(e). Judgment at 1. To the extent that a term of supervised release needs to be re-imposed, the Court does so now, with all of the standard and mandatory conditions required under 18 U.S.C. § 3583(d) and U.S.S.G. § 5D1.3. If Mr. Jones violates any term of his supervised release, he will be subject to up to two (2) additional years of incarceration for each violation, without credit for any time already spent on supervised release.

## IV.    CONCLUSION

For the reasons explained above, the motion for immediate release or resentencing under the First Step Act is **GRANTED in part and DENIED in part**. Mr. Jones's sentence shall be reduced to **450 months**. After his term of imprisonment, the Court **IMPOSES** a term of supervised release of **FIVE (5) YEARS**.

---

two younger incarcerated men he assisted); *id.* at 33:1–34:12 (describing how Mr. Jones speaks to his son and "any youth that come[s] across [him]"). Even if Mr. Jones had concerns about any comments implicating his Fifth Amendment rights, Def.'s Reply at 9, no such issues existed with respect to his earlier manslaughter conviction, for which he had already served the time. *See* 2004 PSR ¶ 157 (indicating that Mr. Jones was sentenced to fifteen years imprisonment on November 7, 1985, released to parole on May 1, 1994, remanded due to a parole violation on May 24, 1995, and discharged from prison on August 6, 1996). While not dispositive, Mr. Jones missed an opportunity.

The Clerk of Court is respectfully directed to file an amended judgment.

**SO ORDERED** at Bridgeport, Connecticut, this 29th day of May, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE